IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| TAMMY P.[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil No. 3:25-cv-01356-RJD[2] |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM and ORDER**

**DALY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Social Security disability benefits under 42 U.S.C. § 423.

**Procedural History**

On April 25, 2022, Plaintiff filed an application for child's insurance benefits based on disability and supplemental security income, claiming disability due to headaches, degenerative changes in her spine, depression, attention deficit hyperactivity disorder ("ADHD"), and anxiety with an onset of April 12, 2021. (Tr. 24, 27). These claims were denied initially on December 2, 2022, and upon reconsideration on August 21, 2023 (Tr. 24). Thereafter, Plaintiff filed a written request for hearing, which was held on January 25, 2024, via online video. (Tr. 24). On February 07, 2024, the ALJ issued an unfavorable decision, which became final and appealable on February 27, 2025, when the Appeals Council declined Plaintiff's request for review. (Tr. 1, 21). On June

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). (Doc. 11).

11, 2025, the Appeals Council issued an order granting an extension of time to file a Civil Action (Tr. 7).

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

1. Whether the ALJ committed a reversible error by mischaracterizing the medical evidence regarding Tylenol use and Plaintiff's headache diary and creating a false narrative of non-compliance.

2. Whether the ALJ erred as a matter of law by failing to adequately evaluate whether Plaintiff's debilitating migraines equaled listing 11.02B.

## Applicable Legal Standards

To qualify for benefits, a claimant must be disabled within the meaning of the applicable statute.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is

[3] The statutes and regulations pertaining to Disability Insurance Benefits ("DIB") are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. ¶ 404. The statutes and regulations pertaining to Supplemental Security Income ("SSI") are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. ¶ 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925, which details medical considerations relevant to an SSI claim, relies on 20 C.F.R. ¶ 404, Subpt. P. Most citations herein are to the DIB regulations out of convenience.

disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The plaintiff bears the burden of proof at steps 1–4. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

Importantly, the Court's scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but the Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), *as amended on reh'g in part* (May 12, 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. The ALJ found that as of the alleged onset date of April 12, 2021, Plaintiff had not attained age 22, and that she had not since engaged in any substantial gainful activity. (Tr. 26). He also found that Plaintiff had the following severe impairments: Chronic mixed headache syndrome, Degenerative changes at C3-C4, obesity, post herpetic neuralgia, Attention Deficit/Hyperactivity Disorder (ADHD), Major Depressive Disorder (MDD), and Generalized Anxiety Disorder (GAD) (20 CFR ¶ 404.1520(c) and 416.920(c)). (Tr. 27). Then the ALJ concluded that none of those conditions met or equaled a listed impairment. (*Id.*). Regarding Plaintiff's chronic mixed headache syndrome, the ALJ specifically noted:

> The undersigned has considered the claimant's headaches per SSR 19-4, which deals with primary headache disorders, and finds that the criteria of listing 11.02, which deals with epilepsy, the most closely analogous listed impairment, are not met, because the severity of the claimant's headaches do[es] not meet the criteria of the subparts of this listing. Per the listing at 11.02, the severity and frequency of the claimant's headaches, do not meet the criteria of the subparts of this listing because the record does not show dyscognitive seizures occurring at least once a week for at least three consecutive months despite adherence to prescribed treatment; or dyscognitive seizures occurring at least once every two weeks for at least 3 consecutive months despite adherence to prescribed treatment and marked limitation in one area of functioning: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.
>
> The record shows that the claimant reported headaches occurring once a week after a neurology specialist prescribed Aimovig and sumatriptan (Exhibit 7F-12). However, the claimant was also recommended to stop taking OTC medication (Tylenol), which their headache log indicated that they continued to take, and headache log was inconsistent with reports to her neurology specialist regarding frequency and duration of headaches (Exhibit 22E). Thus, the undersigned finds that the claimant's reports of frequency and duration of headaches is not reliable, and therefore the criteria of this listing is not met.

(Tr. 28).

Thereafter, the ALJ found that Plaintiff retained the following RFC:

> to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except can frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolding; frequently balance, stoop, kneel, crouch, and crawl; need to avoid concentrated exposure extreme cold, bright light such as direct sunlight, extreme heat, loud noise, vibration and other irritants such as fumes, odors, dusts, gases and poor ventilation; and need to avoid concentrated exposure to hazards such as unprotected heights. Additionally, the claimant is able to understand, remember, and carry out instructions for simple tasks on a sustained basis in a work setting requiring no more than occasional interactions with coworkers, supervisors and the general public for purposes of performing simple tasks; and is able to tolerate simple changes in the routine work setting.

(Tr. 29). The ALJ then found that there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform, and concluded that Plaintiff had not been under a disability from April 12, 2021. (Tr. 39).

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by the parties.

**1. Relevant Medical Records**

Medical records from Carle RMH Primary Care dated August 3, 2021, indicated that Plaintiff reported daily headaches for the past couple of months accompanied by sensitivity to light and nausea. (Tr. 374). Plaintiff stated that she had been tracking her headaches, with daily headaches being noted for the past 2 weeks. She reported the migraines were around the back of her neck and up into the base of her skull. (Tr. 374). The record indicates that she had been using Ibuprofen daily with minimal relief of symptoms. (Tr. 374).

Medical records from Carle Primary Care Clinic dated July 15, 2022, showed that Plaintiff

reported worsening headaches. (Tr. 509). She stated that she was having a headache that started on July 7th and that she was waking up nauseous on many days. (Tr. 509). That morning, she couldn't see out of either eye because she couldn't lift her eyelids and was experiencing sensitivity to light and noise. (Tr. 509). She reported headaches at level 6-7 on a scale of 1-10, accompanied by neck and teeth pain. (Tr. 509). She also reported daily headaches for the last month and that Meloxicam did not help anymore. (Tr. 509). She also stated she was constantly worried she was going to have a headache and would not be able to go on with her day. (Tr. 509). (Tr. 509).

Medical records from Carle Richland Memorial Hospital dated August 24, 2022, showed that Plaintiff reported worsening headaches. (Tr. 516). Medical records from the Emergency Department at Carle Richland Memorial Hospital dated September 18, 2022, showed that Plaintiff required urgent care for a migraine which was accompanied by blurry vision. (Tr. 477). She was administered a headache cocktail. (Tr. 478). Medical records from Carle Richland Memorial Hospital dated September 21, 2022, showed that Plaintiff reported worsening headaches and was given a referral to neurology. (Tr. 519-520). She was also prescribed Propanolol. (Tr. 520).

Medical records from Main Campus PBB dated November 18, 2022, indicate that Plaintiff's headaches began around August of 2020 prior to starting her freshman year of college but had increased significantly in frequency and severity since that time. (Tr. 647). She had been having headaches daily for the last few months. (Tr. 647). APRN Kyly Arloff documented that Plaintiff would often wake up with a mild headache that could progress gradually or rapidly into a severe headache later in the day. (Tr. 647). Her pain presented in various locations throughout her head, but she often noticed her severe headaches on the left side of her forehead. (Tr. 647). Her pain could range from dull to throbbing, with occasional sharp, stabbing pains as well. (Tr. 647).

She had severe photophobia and phonophobia associated with her headaches, as well as associated dizziness and blurry vision. (Tr. 647). She was using Tylenol, sometimes several doses, every day for management of her headaches and was taking Propranolol without improvement in her symptoms. (Tr. 647). She was also consistent with taking Venlafaxine and Gabapentin with no noticeable improvement in her headaches. (Tr. 647). APRN Arloff advised her to stop all OTC analgesics for 7-10 days to see if her headaches improve and advised that the headaches would likely worsen before getting better. (Tr. 650). APRN Arloff stated that she could then resume Tylenol as needed, with strict instructions not to take more than 2-3 doses per week to avoid future rebound headaches. (Tr. 650). APRN Arloff also documented that Plaintiff was reporting several migraine headaches per week and had not seen any improvement with Gabapentin, Venlafaxine, or Propranolol, so APRN Arloff ordered Aimovig 70 mg once monthly injection for migraine prevention. (Tr. 650).

On March 20, 2023, Plaintiff had a follow-up visit for her headaches at Main Campus PBB. Plaintiff reported that her headaches significantly improved on Aimovig. (Tr. 636). Having been administered three injections of that medication, she reported only one headache per week, decreased from near-daily headaches. (Tr. 636). She reported some persistent nausea after starting the Aimovig injections but felt that this had improved gradually. (Tr. 636). She found Sumatriptan very helpful at breaking her migraine headaches but mentioned some atypical numb sensations in her body after using the medication (Tr. 636).

**2. <u>Medical Opinions</u>**

State agency medical consultant John Peterson, M.D., found Plaintiff capable of medium work subject only to postural and environmental restrictions. (Tr. 74-76; 85-87). State agency

medical consultant Calixto Aquino, M.D., concurred but opined that Plaintiff had some additional climbing limitations. (Tr. 96-98; 108-10). Both doctors considered claims of ongoing, debilitating headaches but found the reported symptoms partially unsupported by the evidence. (Tr. 72, 93-94; 108-10). The ALJ found the opinions persuasive and adopted their findings except for further limiting Plaintiff to no concentrated exposure to bright lights (Tr. 37-38).

Plaintiff's primary physician, FNP Gretchen Ginder, also provided a medical opinion. Tr. 773-74). She concluded that headaches, wrist and knee pain, and neuralgia would cause Plaintiff to experience 21 bad days every 28 days, and render her 50 percent off-task and need to lie down throughout the workday. (*Id.*). The ALJ found the opinion unsupported because FNP Ginder found that conditions such as knee pain caused significant limitations, despite Plaintiff having very little relevant treatment. (Tr. 38).

## <u>Analysis</u>

### 1. <u>Material Mischaracterization of Medical Evidence</u>

Plaintiff first argues that the ALJ committed a reversible error by mischaracterizing the medical evidence regarding Plaintiff's Tylenol use and headache diary, creating a false narrative of non-compliance. She argues that this was a reversible error because it resulted in the ALJ finding Plaintiff's subjective reports regarding her symptoms unreliable and affected the ALJ's formulation of RFC and step 3 analysis. For the reasons explained below, the Court disagrees.

<u>Assessment of Subjective Reports</u>

An ALJ's assessment of a claimant's reports regarding the "intensity, persistence, and limiting effects of" her subjective symptoms will not be disturbed unless it is "patently wrong," meaning that it "lacks any explanation or support." *Weber v. Kijakazi*, No. 20-2990, 2021 WL

3671235, at *5 (7th Cir. Aug. 19, 2021) (citation and internal quotation marks omitted). At the same time, when that assessment rests on "objective factors or fundamental implausibilities rather than subjective considerations," such as the demeanor of the claimant, the court has "greater freedom to review" that assessment. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (citation and internal quotation marks omitted). An ALJ must "adequately explain" whether the claimant's report of subjective symptoms is persuasive or not and discuss "specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *Soc. Sec. Ruling 16-3p: Titles II & Xvi: Evaluation of Symptoms in Disability Claims*, SSR 16-3P (S.S.A. Mar. 16, 2016) (superseding SSR 96-7p). Although an ALJ does not need "to address every piece of evidence," some legitimate reason must be articulated to establish an "accurate and logical bridge from the evidence to [the] conclusion." *Clifford*, 227 F.3d at 872 (citation omitted).

**a. <u>Tylenol Use</u>**

Plaintiff first accuses the ALJ of materially mischaracterizing a medical recommendation by APRN Arloff, dated November 18, 2022, regarding the recommended use of Tylenol and other over-the-counter ("OTC") medication for treating Plaintiff's headaches. The medical record at issue states:

> I'm suspicious that her frequent use of Tylenol could be giving her rebound headaches, causing the dull headaches that she's experiencing virtually every day. *I recommended that she stop all OTC analgesics for 7-10 days to see if her headaches improve.* She is aware that the headaches will likely worsen before they get better. *She can then resume Tylenol as needed, with strict instructions not to take more than 2-3 doses per week to avoid future rebound headaches*.

(Tr. 650) (emphasis added). On March 20, 2023, APRN Arloff summarized that prior encounter, noting that Plaintiff "started on Aimovig 70 mg monthly injections" and "on sumatriptan 100 mg

for migraine rescue," and that "[s]he was also recommended to come off of OTC analgesics as there was concern she may have been dealing with rebound headaches." (Tr. 636).

Plaintiff argues that the ALJ mischaracterized the cited record as to the recommendation to discontinue OTC medication, and that he "created the impression that Plaintiff was instructed to permanently stop taking Tylenol and that her continued use represented non-compliance with medical advice." (Doc. 17, p. 11). She contends that any use of Tylenol more than 7-10 days after the November 18, 2022, visit would not violate APRN Arloff's medical instructions. She claims that the alleged mischaracterization of the medical record "became the foundation for the adverse credibility determination regarding Plaintiff's headache frequency" and resulted in reversible errors at step 3 and in formulating the RFC at step 4. (Doc. 17, p. 9). The Court disagrees.

The ALJ discussed Plaintiff's use of Tylenol and OTC medication three times in the decision. First, in finding at step 3 that Plaintiff's severity and frequency of her headache-related symptoms did not equal the criteria of 11.02 Listing, the ALJ noted:

> [Plaintiff's] reported headaches occurring once a week after a neurology specialist prescribed Aimovig and sumatriptan (Exhibit 7F-12)," but Plaintiff "was also recommended to stop taking OTC medication (Tylenol), which their headache log indicated that [Plaintiff] continued to take . . . (Exhibit 22E).

(Tr. 28, citing Tr. 636, 230-356). Later in the decision, in assessing Plaintiff's subjective symptoms, the ALJ discussed again APRN Arloff's medical record dated November 18, 2022, stating:

> The claimant was assessed with near-daily tension headaches that could progress in the severe migraine headaches but Mr. Arloff indicated that the frequent use of Tylenol could be giving the claimant rebound headaches which cause the dull headaches that [she] was experiencing virtually every day and *he recommended that the claimant stop all over-the-counter analgesics for 7 to 10 days*.

(Tr. 33, citing Tr. 636) (emphasis added). Thereafter, in discussing inconsistencies between

Plaintiff's subjective reports and the medical records, the ALJ added: "Despite reports to the contrary, the migraine log shows no reduction in headaches after starting Aimovig and sumatriptan, but shows a change from ibuprofen to Tylenol, *which the neurology specialist recommended avoiding due to rebound headaches*." (Tr. 35) (emphasis added).

Reading the decision as a whole, the Court finds that the ALJ did not materially misrepresent APRN Arloff's medical note regarding the use of Tylenol. The ALJ explicitly stated in his discussion of the medical records at step 4 that Plaintiff was to discontinue Tylenol for only 7-10 days. That portion of the ALJ's decision does not appear in Plaintiff's brief despite Plaintiff devoting several pages to the alleged misrepresentation by the ALJ.

Further, the ALJ adequately supported his finding that Plaintiff did not comply with APRN Arloff's recommendation to stop taking OTC medication. (*See* Tr. 28, citing Tr. 636, 230-356; Tr. 35, citing 636). First, the headache log, which the ALJ cited in making that finding, shows that Plaintiff actually used Tylenol within 7-10 days after the November 18, 2022, visit. (Tr. 343). Specifically, on November 22, 2022, Plaintiff noted: "Going to the doctor and getting medicine for migraines. A monthly injection and an emergency medication. *I took more Tylenol after the appointment and that helped*." (*Id.*) (emphasis added). Between November 25, 2022, and November 29, 2022, Plaintiff noted a 3/10 headache, which she treated again with Tylenol. (*Id.*). Accordingly, the cited record supports a finding that Plaintiff did not comply with her neurologist's recommendation to refrain from Tylenol for the 7-10 days after November 18, 2022.

Moreover, the cited record supports the conclusion that Plaintiff did not comply with the recommendation not to exceed 2-3 dosages per week after those 7-10 days. For instance, between July 5, 2023, and July 13, 2023, Plaintiff noted headache, which she treated by "[l]ying in bed for

3 hours a day along with *constant* Tylenol." (Tr. 346). Plaintiff further noted having a migraine from November 4, 2023, through November 19, 2023, which she treated by "[l]ying in bed after taking Tylenol for 1-3 hours *most days* & taking Sumatriptan *on the last day*." (Tr. 348) (emphasis added). Less than a week later, on November 24, 2023, Plaintiff again reported headache, which lasted through November 30, 2023, and she treated with "occasional" use of Tylenol and "lying in bed for 2 hours at a time." (Tr. 348). Plaintiff also reported in her log multiple headaches or migraine events after November 18, 2022, which lasted for several days, and which Plaintiff indicated treating with Tylenol, without indication of use of the prescribed rescue medication sumatriptan. (*See, e.g.*, Tr. 345: June 1, 2013, - June 15, 2023; Tr. 347: September 26, 2023-September 30, 2023; Tr. 349: December 7, 2023, through December 15, 2023). Thus, by citing Plaintiff's diary and pointing to Plaintiff's continuous use of the Tylenol medication, the ALJ adequately supported his finding that Plaintiff failed to comply with the APRN Arloff's recommendation to avoid more than 2-3 doses of Tylenol per week.

Therefore, the Court finds that the ALJ did not materially misrepresent the record regarding the recommended use of Tylenol and Plaintiff's compliance with it.

### b. **ALJ's Finding of Inconsistencies between Plaintiff's Headache Log and the Medical Evidence**

Next, Plaintiff argues that the ALJ mischaracterized Plaintiff's headache diary entries as being inconsistent with her neurology records. Plaintiff points to the following part of the decision where the ALJ assessed Plaintiff's reported symptoms:

> The claimant testified that she needed to lie down 10-15 days a month due to migraine headaches. Treatment notes from the claimant's neurology specialist, from March 2023, indicate the headaches were improved to only one headache per week with no follow up appointment complaints (Exhibit 7F-12). The claimant's migraine tracker/log, however is inconsistent with the treatment notes. Despite

> reports to the contrary, the migraine log shows no reduction in headaches after starting Aimovig and sumatriptan, but shows a change from ibuprofen to Tylenol, which the neurology specialist recommended avoiding due to rebound headaches. The claimant reported to Social Security in July 2023 having daily migraine headaches and had to lie in a dark room for hours almost daily (Exhibit 9E). However, the claimant had reported to Mr. Arloff having migraine headaches only once per week in March 2023, and the headache log indicated 15 days of headaches in June, but no follow-up care with Mr. Arloff."

(Tr. 35).

Plaintiff asserts the ALJ failed to point to any inconsistency between the headache log and the medical records before her last visit to the neurology specialist on March 20, 2023. Yet, the ALJ explained that the log showed no reduction in headache frequency after starting Aimovig injection and sumatriptan, despite Plaintiff reporting to the neurology specialist that the medication reduced her migraines from near-daily to only one per week. (Tr. 35, citing Tr. 636). While the cited medical record is from March 20, 2023, it also summarizes Plaintiff's prior visit on November 19, 2022, when the neurology specialist prescribed Aimovig injection and sumatriptan. (*Id.*; see also Tr. 650). Further, in the preceding paragraph, the ALJ pointed to a medical record showing that on December 20, 2022, Plaintiff visited her primary medical care provider and reported starting a new medication from the neurologist that improved her headaches. Tr. 34, citing 643 ("Started Aimovig from neurologist. Headaches have been much better").

Accordingly, the medical record on which the ALJ relied for his inconsistency finding shows that between December 2022 and March 2023 Plaintiff's headaches had improved from nearly daily to one per week. Plaintiff's headache log entries for that same period, on the other hand, show more frequent headaches and migraines, some of which lasted multiple days. (Tr. 343-44: 6/10 headache from 12/5/2022-12/17/2022; 4/10 headache from 1/15/2023-1/25/2023). (*Id.*). Accordingly, the ALJ's finding of inconsistencies between the relevant medical record and the

headache log was adequately supported by the cited record.

Plaintiff further challenges the ALJ's finding of inconsistency between her reports of migraine headaches only once per week in March 2023, and the "headache log indicated 15 days of headaches in June, but no follow-up care with Mr. Arloff." Tr. 35. She argues that this finding is based on a speculation that Plaintiff's symptoms had not worsened by June 2023. The ALJ's inconsistency finding, however, was based on the fact that Plaintiff noted a relapse from one migraine per week to a migraine lasting 15 days, but her medical records did not show a follow-up with her provider.

In any case, as the Commissioner points out, in formulating Plaintiff's RFC, the ALJ relied on the medical opinions of two state agency medical consultants. (Tr. 36-38). John Peterson, M.D., found Plaintiff capable of medium work subject only to postural and environmental restrictions. (Tr. 37, 74-76; repeated at Tr. 85-87). State agency medical consultant Calixto Aquino, M.D. concurred on relevant parts. (Tr. 37, 96-98; repeated at Tr. 108-10). Both doctors considered claims of ongoing, debilitating headaches (Tr. 72, 93-94), but found the evidence partially unsupported and allowed for medium work. The ALJ found these opinions persuasive and adopted their findings, except for limiting Plaintiff further by including no concentrated exposure to bright lights. (Tr. 37-38). Plaintiff did not challenge those medical opinions or the ALJ's overall assessment of the medical opinions on record. Accordingly, the ALJ's RFC formulation was adequately supported by the record.

Thus, the Court finds that the ALJ did not commit a reversible error by mischaracterizing the medical evidence regarding Tylenol use or the headache diary and creating a false narrative of non-compliance.

**2. <u>ALJ's Finding that Plaintiff's Migraines did not equal Listing 11.02B</u>**

Plaintiff next argues that the ALJ committed a reversible error at step 3 by failing to adequately evaluate whether Plaintiff's migraines equaled Listing 11.02B. The Court disagrees.

<u>Step 3 Analysis</u>

At step 3, the ALJ assesses whether the combination of the claimant's medically determinable impairments meets or medically equals the severity of any impairment in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). In the absence of a directly applicable listing, the claimant may qualify for benefits "by showing that her unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment. *Sullivan v. Zebley*, 493 U.S. 521, 531, 110 S. Ct. 885, 891, 107 L. Ed. 2d 967 (1990), *superseded by statute on other grounds*. To satisfy this burden, the claimant must present medical findings that are equally severe to "*all* the criteria for the one most similar listed impairment." *Id.* "[T]he medical criteria defining the listed impairments [are set] at a higher level of severity than the statutory standard" because the "listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Id.* at 532 (quoting 20 C.F.R. § 416.925(a)). "A finding of medical equivalence requires an expert's opinion on the issue. *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (citing *Barnett v. Barnhart,* 381 F.3d 664, 670 (7th Cir. 2004)).

The Seventh Circuit requires that a step 3 analysis discusses any applicable listings "by name and offer more than a perfunctory analysis of the listing." *Barnett,* 381 F.3d at 668. The ALJ's rationale must be sufficient for a subsequent reviewer or court to understand the decision. SSR 17-2. However, the ALJ's decision must be read as a whole, and a conclusory discussion of

the ALJ's step 3 finding will not be fatal if the discussion regarding the claimant's RFC provides adequate rationale. SSR 17-2p; *Zellweger v. Saul*, 984 F.3d 1251, 1255 (7th Cir. 2021) (noting that an ALJ's analysis of a claimant's RFC "may doubly explain how the evidence shows the claimant's impairment is not presumptively disabling under the pertinent listing"). Further, a plaintiff cannot prevail on a step-three challenge unless she first establishes that their impairment satisfies the listing at issue. *Sosinski v. Saul*, 811 F. App'x 380, 381 (7th Cir. 2020).

While primary headache disorder is not a listed impairment, Social Security Ruling 19-4p instructs that epilepsy (Listing 11.02) is the most closely analogous because, rarely, "a person with a primary headache disorder may exhibit equivalent signs" and cognitive limitations. *See Soc. Sec. Ruling, SSR 19-4p; Titles II & XVI: Evaluating Cases Involving Primary Headache Disorders*, SSR 19-4P (S.S.A. Aug. 26, 2019) (*available at* 2019 WL 4169635). Once an ALJ finds that a headache disorder is a severe impairment under step 2, he must next determine whether it is medically equivalent to Listing § 11.02B or D (epilepsy) either singly or in combination with another medically determinable impairment. Listing 11.02B requires dyscognitive seizures that occur "at least once a week for at least 3 consecutive months despite adherence to prescribed treatment." 20 C.F.R. § 404, subpt. P, app. 1, § 11.02B. "Dyscognitive seizures are characterized by alteration of consciousness without convulsions or loss of muscle control. During the seizure, blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances) may occur." 20 C.F.R. ¶ 404, Subpart P, Appendix 1, § 11.00H(1)(b).

In determining whether a primary headache disorder is equivalent to Listing 11.02B, the ALJ is to consider:

> [a] detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatments, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 WL 4169635, at *7.

Here, the ALJ's rationale in the step 3 analysis adequately supported his finding that the "severity and frequency" of Plaintiff's headaches did not equal Listing 11.02B because the record did not show symptoms "occurring at least once a week for at least three consecutive months despite adherence to prescribed treatment." (Tr. 28). The ALJ then explained that Plaintiff "reported headaches occurring once a week after a neurology specialist prescribed Aimovig and sumatriptan (Exhibit 7F-12)," but Plaintiff "was also recommended to stop taking OTC medication (Tylenol), which their headache log indicated that [Plaintiff] continued to take . . . (Exhibit 22E)." (*Id.*). This shows non-adherence to prescribed treatment and supports the conclusion that Plaintiff's symptoms did not equal Listing 11.02B.

Further, any deficiencies in the ALJ's step 3 analysis were cured by the ALJ's discussion in the section assessing Plaintiff's RFC. As explained above, the ALJ's RFC finding was substantially supported by the opinions of two state agency physicians. (Tr. 37-38). The Commissioner correctly points out that the state agency physicians considered Listing 11.02 and did not find that Plaintiff's migraine-related symptoms matched the required severity and frequency. (Tr. 74, 96). Notably, "[a] finding of medical equivalence requires an expert's opinion on the issue." *Minnick*, 775 F.3d at 935. Here, no medical source opined that Plaintiff met or

equaled Listing 11.02, and Plaintiff has not challenged the ALJ's assessments of the medical opinions on record. Accordingly, the state agency physicians' conclusion substantially supports the ALJ's decision that Plaintiff's symptoms did not equal Listing 11.02.

Plaintiff also accuses the ALJ of impermissible cherry-picking by discounting Plaintiff's self-reported symptoms as being inconsistent with the medical record while ignoring the treating specialist's clinical documentation of those symptoms. She argues that the neurology specialist's medical records show that even with prescribed medication, Plaintiff continued to experience migraines once a week. She further points to other parts of the medical record to assert that the severity of Plaintiff's migraine headaches was equivalent to the dyscognitive seizures required to establish Listing 11.02. (Doc. 17, p. 19-25). However, in the absence of a medical opinion supporting Plaintiff's assertion, this record is insufficient to establish Listing 11.02. *See Minnick,* 775 F.3d at 935 ("[a] finding of medical equivalence requires an expert's opinion on the issue")*;* *Sosinski*, 811 F. App'x at 381 (finding that a plaintiff cannot prevail on a step-three challenge unless she first establishes that their impairment satisfies the listing at issue).

## Conclusion

The Commissioner's final decision denying Tammy P.'s application for Social Security disability benefits is **AFFIRMED.** The Clerk of Court is directed to enter judgment in favor of the Commissioner and close the case.

**IT IS SO ORDERED.**

**DATED: August 27, 2026**

**Hon. Reona J. Daly**
**United States Magistrate Judge**